UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| BUSTER CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 0: 16-017-DCR |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

***     ***     ***     ***

| | | |
|---|---|---|
| CRYSTAL R. MEADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 0: 16-061-DCR |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

***     ***     ***     ***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | | |
|---|---|---|
| TIMOTHY L. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | Civil Action No. 7: 16-051-DCR |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

***     ***     ***     ***

-1-

RODNEY JUSTICE,                          )
                                         )
     Plaintiff,                      )
                                         )
V.                                       )      Civil Action No. 7: 16-059-DCR
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
     Defendant,                      )

                       \*\*\*     \*\*\*     \*\*\*     \*\*\*

MARGIE LEWIS,                            )
                                         )
     Plaintiff,                      )
                                         )
V.                                       )      Civil Action No. 7: 16-068-DCR
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
     Defendant,                      )

                       \*\*\*     \*\*\*     \*\*\*     \*\*\*

DANIEL L. DOUCETTE,                      )
                                         )
     Plaintiff,                      )
                                         )
V.                                       )      Civil Action No. 7: 16-075-DCR
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
     Defendant,                      )

                       \*\*\*     \*\*\*     \*\*\*     \*\*\*

CAROLYN GRIFFITH,                          )
                                           )
    Plaintiff,               )
                                           )
V.                                         )     Civil Action No. 7: 16-101-DCR
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
    Defendant,               )

                            ***    ***    ***    ***

ROBERT MARTIN,                             )
                                           )
    Plaintiff,               )
                                           )
V.                                         )     Civil Action No. 7: 16-111-DCR
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
    Defendant,               )

                            ***    ***    ***    ***

STANLEY CAUDILL,                           )
                                           )
    Plaintiff,               )
                                           )
V.                                         )     Civil Action No. 7: 16-153-DCR
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
    Defendant,               )

                            ***    ***    ***    ***

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

These matters are pending for consideration of Defendant Carolyn Colvin, Acting

Commissioner of Social Security's, motions to dismiss in part.  Pursuant to Rule 56 of the

Federal Rules of Civil Procedure and the Notices entered in each case, the motions to dismiss in part were converted to motions for summary judgement in part. The parties were given time to respond, and the matters are ripe for review. Because there are no disputes regarding the material facts, and because resolution of the legal issues favor the defendant, the Acting Commissioner's motions will be granted.

## I.   BACKGROUND

**Ashland Civil Action No. 0: 16-017 – Buster Carter**

Plaintiff Buster Carter is a resident of Lawrence County, Kentucky. Prior to his application for disability benefits, Carter worked for 10 years as a coal miner and approximately 20 years as a truck driver. [Ashland Civil Action No. 0: 16-017; Record No. 4, pp. 4, 5] After being denied Social Security Disability Insurance benefits ("DIB") in a January 29, 2009 application, Carter submitted new medical evidence and requested a hearing on April 27, 2010. [Ashland Civil Action No. 0: 16-017; Record No. 7-1, p. 4] No hearing was held, however. Instead, Carter's application was approved in a fully-favorable, on-the-record decision dated August 3, 2010. [*Id.* at p. 1] The decision found Carter to have been disabled since November 22, 2008. [*Id.*] Carter was represented in the latter action by attorney Eric Conn, and the new medical evidence was submitted by Dr. Frederic Huffnagle, M.D. (now deceased). [*Id.*] Administrative Law Judge ("ALJ") David Daugherty reviewed Carter's case and issued the on-the-record decision. [*Id.*]

Conn, Huffnagle, and Daugherty have been implicated in a scheme to defraud the Social Security Administration.[1] That scheme is the basis for the present controversy.

---

[1]   On April 1, 2016, a federal grand jury returned an indictment against Eric Conn, David Daugherty, and Alfred Adkins. [*See* Lexington Criminal Action No. 5: 16-022-DCR.] The

**Ashland Civil Action No. 0: 16-061 – Crystal R. Meade**

Plaintiff Crystal Meade also is a resident of Lawrence County, Kentucky.  [Ashland Civil Action No. 0: 16-061; Record No. 1, p. 1]  Prior to her application for disability benefits, Meade worked for the State of Kentucky for approximately 20 years processing food stamp and Medicaid requests.  [Ashland Civil Action No. 0: 16-061; Record No. 15-1, p. 23]  After being denied Social Security Disability Insurance Benefits ("DIB") in a December 25, 2008 application, Meade submitted new medical evidence and requested a hearing on May 15, 2009. [*Id.* at p. 12]  Without holding a hearing, ALJ David Daugherty issued a fully-favorable decision on August 7, 2009, concluding that Meade had been disabled since January 1, 2007. [Ashland Civil Action No. 0: 16-061; Record No. 6-1, p. 4]  Meade was represented in the latter action by Eric Conn and ALJ Daugherty relied on the opinions of Dr. Frederic Huffnagle, M.D.  [*Id.* at pp. 4, 6]

**Pikeville Civil Action No. 7: 16-051 – Timothy L. Howard**

Plaintiff Timothy Howard is a resident of Knott County, Kentucky.  [Pikeville Civil Action No. 7: 16-051; Record No. 1, p. 1]  Prior to his application for disability benefits, Howard worked as a gas well operator, electrician, and maintenance technician.  [Pikeville

---

indictment contains 18 substantive counts and several additional forfeiture counts.  The counts are related to allegations of fraud that are discussed in this Memorandum Opinion and Order. The criminal action has been deemed to be complex with a trial scheduled in 2017.  The criminal action is pending before the undersigned.

On June 1, 2016, a criminal information was filed before the undersigned, charging former Administrative Law Judge Charlie Paul Andrus with conspiring with Eric Conn and others to retaliate against individuals who had provided information relating to the alleged fraudulent scheme.  [*See* Lexington Criminal Action No. 5: 16-056-DCR.]  Defendant Andrus entered a guilty plea at the time the information was filed.

Civil Action No. 7: 16-051; Record No. 12-1, p. 34]  After being denied Social Security Disability Insurance Benefits ("DIB") in a December 28, 2006 application, Howard submitted new medical evidence and requested a hearing on May 31, 2007.  [*Id.* at p. 21]  Without holding a hearing, ALJ David Daugherty issued a fully-favorable decision on July 9, 2007, concluding that Howard had been disabled since May 11, 2006.  [*Id.*]  Howard was represented in the latter action by Eric Conn and ALJ Daugherty relied on the opinions of Dr. Frederic Huffnagle, M.D. [*Id.* at p. 7]

**Pikeville Civil Action No. 7: 16-059 – Rodney Justice**

Plaintiff Rodney Justice is a resident of Pike County, Kentucky.  [Pikeville Civil Action No. 7: 16-059; Record No. 1, p. 1]  Prior to his application for disability benefits, Justice worked as a coal miner and heavy laborer.  [Pikeville Civil Action No. 7: 16-059; Record No. 19-1, p. 24]  After being denied Social Security Disability Insurance Benefits ("DIB") in an October 31, 2006 application, Justice submitted new medical evidence and requested a hearing on April 26, 2007.  [Pikeville Civil Action No. 7: 16-059; Record No. 13-1, p. 21]  Without holding a hearing, ALJ David Daugherty issued a fully-favorable decision on June 8, 2007, concluding that Justice had been disabled since April 6, 2005.  [*Id.*]  Justice was represented in the latter action by Eric Conn and ALJ Daugherty relied on the opinions of Dr. Frederic Huffnagle, M.D.  [*Id.* at pp. 4, 7]

**Pikeville Civil Action No. 7: 16-068 – Margie Lewis**

Plaintiff Margie Lewis is a resident of Floyd County, Kentucky.  [Pikeville Civil Action No. 7: 16-068; Record No. 1, p. 1]  Prior to her application for disability benefits, Lewis worked as a nursing aide and daycare assistant.  [Pikeville Civil Action No. 7: 16-068; Record

No. 17-1, p. 48]  After being denied Social Security Disability Insurance Benefits ("DIB") in a March 30, 2009 application, Lewis submitted new medical evidence and requested a hearing on May 21, 2009.  [*Id.* at p. 15]  Without conducting a hearing, ALJ David Daugherty issued a fully-favorable decision on July 2, 2009, concluding that Lewis had been disabled since June 30, 2008.  [Pikeville Civil Action No. 7: 16-068; Record No. 10-1, pp. 4, 7]  Lewis was represented in the latter action by Eric Conn and ALJ Daugherty relied on the opinions of Dr. Frederic Huffnagle, M.D.  [*Id.* at pp. 4, 6.]

**Pikeville Civil Action No. 7: 16-075 – Daniel L. Doucette**

Plaintiff Daniel Doucette is a resident of Magoffin County, Kentucky.  [Pikeville Civil Action No. 7:  16-075; Record No. 1, p. 1]  Doucette has past relevant work experience as a cable installer, corrections officer, and brick layer.  [Pikeville Civil Action No. 7: 16-075; Record No. 5-3, p. 5]  Doucette filed an application for Social Security Disability Insurance Benefits ("DIB") on February 20, 2009.  [Pikeville Civil Action No. 7: 16-075; Record No. 1, p. 2]  Without holding a hearing, ALJ David Daugherty issued a fully-favorable decision on July 2, 2009, concluding that Doucette had been disabled since July 1, 2008.  [Pikeville Civil Action No. 7: 16-075; Record No. 5-1, p. 1, 7]  Doucette was represented by Eric Conn and ALJ Daugherty relied on the opinion of Dr. Frederic Huffnagle.  [*Id.* at pp. 1, 6]

**Pikeville Civil Action No. 7: 16-101 – Carolyn Griffith**

Plaintiff Carolyn Griffith is a resident of Pike County, Kentucky.  [Pikeville Civil Action No. 7: 16-101; Record No. 1, p. 1]  After being denied Supplemental Security Income benefits ("SSI") in a February 13, 2008 application, Griffith submitted new medical evidence and requested a hearing on June 24, 2008.  [Pikeville Civil Action No. 7: 16-101; Record No. 11-2, p. 6]  Griffith was subsequently awarded SSI benefits on July 31, 2008, based on a

finding that she had been disabled since February 8, 2008.  [Pikeville Civil Action No. 7: 16-101; Record No. 11-1, p. 1]  In her latter application for SSI benefits, Griffith was represented by attorney Conn.  [*Id.*]  She received a fully-favorable, on-the-record decision by ALJ Daugherty, which relied on medical evidence submitted by Dr. Bradley Adkins, Ph.D.  [*Id.*]  As noted in footnote 1 above, Adkins also is charged in a scheme to defraud the Social Security Administration.

**Pikeville Civil Action No. 7: 16-111 – Robert Martin**

Plaintiff Robert Martin is a resident of Floyd County, Kentucky.  [Pikeville Civil Action No. 7:  16-111; Record No. 1, p. 2]  Martin has past relevant work experience as a truck driver. [Pikeville Civil Action No. 7:  16-111; Record No. 18-3, p. 39]  Martin filed an application for Social Security Disability Insurance Benefits ("DIB") on August 12, 2008, and an application for Supplemental Security Income ("SSI") on August 29, 2008.  [*Id.* at 24]  The claim was denied both initially and upon reconsideration.  [*Id.*]  Martin then made a written request for a hearing, with assistance of attorney Conn, on April 9, 2009.  [*Id.*]  Upon the new request, Martin received a fully-favorable decision from ALJ Daugherty on June 11, 2009.  [Pikeville Civil Action No. 7:  16-111; Record No. 10-1, p. 1]  ALJ Daugherty, relying on evidence submitted by Dr. Frederic Huffnagle, M.D., and without holding a hearing, found Caudill to have been disabled beginning on August 4, 2008. [*Id.*]

**Pikeville Civil Action No. 7: 16-153 – Stanley Caudill**

Plaintiff Stanley Caudill is a resident of Letcher County, Kentucky.  [Pikeville Civil Action No. 7:  16-153; Record No. 1, p. 1]  Caudill has past relevant work experience as a maintenance mechanic helper.  [Pikeville Civil Action No. 7:  16-153; Record No. 18-3, p. 28] On March 19, 2008, Caudill filed an application for Social Security Disability Insurance

Benefits ("DIB") alleging a period of disability beginning on December 22, 2006.  [*Id.* at p. 18] The claim was denied both initially and upon reconsideration.  [*Id.*]  Caudill then made a written request for a hearing, with assistance of attorney Conn, on September 23, 2008.  [*Id.*]  Upon the new request, Caudill received a fully-favorable decision from ALJ Daugherty on March 5, 2009.  [Pikeville Civil Action No. 7: 16-153; Record No. 9-1, p. 1]  ALJ Daugherty, relying on evidence submitted by Dr. Frederic Huffnagle, M.D., and without holding a hearing, found Caudill to have been disabled beginning on December 22, 2006.  [*Id.*]

### a.  The Commissioner's Authority

In 1994, Congress amended the Social Security Act ("the Act") to create a streamlined process for the Social Security Administration (the "Agency") to terminate benefits if and when there is reason to believe fraud was involved in the application for those benefits. Specifically, Congress added sections 205(u), 1129(l), and 1631(e)(7) to the Act [42 U.S.C. §§ 405(u), 1320a-8(l), 1383(e)(7)], to require immediate redetermination of benefits under such circumstances.  *See* Pub. L. No. 103-296, § 206(d), the Social Security Independence and Program Improvements Act of 1994, 108 Stat. 1464, 1514.  The legislative history suggests that Congress was displeased with the amount of time taken by the Agency to terminate disability benefits in cases of suspected fraud.[2]  The delay was attributed, in part, to the "cumbersome and unworkable"[3] nature of the process used to reevaluate benefits in such instances, commonly known as the "reopening" procedure.

---

[2]     140 CONG. REC. H4750-03, 1994 WL 274789 (daily ed. June 21, 1994) (statement of Rep. Santorum).

[3]     STAFF OF SUBCOMM. ON OVERSIGHT OF THE H. COMM. ON WAYS & MEANS, 103RD CONG., REP. ON REFORMS TO ADDRESS SUPPLEMENTAL SECURITY INCOME FRAUD AND ABUSE

Reading the statutory language to require a process distinct from the already existing reopening procedure, the Commissioner established a framework for handling these redeterminations, consistent with authority prescribed in sections 205 and 1631 of the Act, 42 U.S.C. §§ 405, 1383.[4]  This framework was established through Social Security Rulings and internal guidelines.  Social Security Rulings do not have the force of law, but they are binding on all components of the Agency, as provided by 20 C.F.R. 402.35(b)(1).  The Agency's internal manual for adjudicating claims, the Hearings, Appeals and Litigation Law Manual ("HALLEX"), is published by the Deputy Commissioner for Disability Adjudication and Review.  *See* HALLEX I-1-0-1 (available at https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html).  HALLEX guidelines, like Social Security Rulings, do not have the force of law. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008).

The current rulings interpreting sections 205(u), 1129(l), and 1631(e)(7) of the Act are 16-1p, 81 Fed. Reg. 13436, and 16-2p, 81 Fed. Reg. 13439.  These rulings went into effect on March 14, 2016, after some of the plaintiffs' redetermination hearings were held.[5]  The ruling

---

INVOLVING MIDDLEMEN 7 (Comm. Print 1994) *available at* http://congressional.proquest.com/legisinsight?id=CMP-1994-WAM-0010&type=PRINT.

[4]     Section 205(a) states:

> The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this title, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

[5]     For example, Carter's redetermination hearing was held on September 29, 2015. [Ashland Civil Action No. 0: 16-017; Record No. 7-1, p. 3]  The ALJ's decision was issued on November 4, 2015.  [*Id.*]  Review by the Appeals Council was denied on December 15,

previously in effect was 00-2p, 65 Fed. Reg. 10140 (effective 02/25/2000). The HALLEX guidelines applicable to redeterminations are found at subsection I-1-3-25 (updated February 25, 2016). The previous version of HALLEX I-1-3-25, updated as provided in Transmittal I-1-83 (https://www.ssa.gov/OP_Home/hallex/TS/tsi-1-83.html), was submitted to the Court in compliance with a September 8, 2016 Order. [Pikeville Civil Action No. 7: 16-101; Record No. 31] The Acting Commissioner asserts that the process outlined in the new rulings reflects that which was followed in the plaintiffs' cases, despite the dates of formal issuance being somewhat later. [*See, e.g.,* Pikeville Civil Action No. 7: 16-101; Record No. 33, pp. 13-14 "Response to Court's Order".]

### b.  Conn Cases

Apart from a few distinctions noted below, the procedural background of plaintiffs' claims are identical. According to letters provided as exhibits to the motions to dismiss, on July 2, 2014, the Office of the Inspector General ("OIG") sent notice pursuant to §1129(l) of the Act, 42 U.S.C. § 1320a-8(l). [*See, e.g.,* Ashland Civil Action No. 0: 16-017; Record No. 7-1, p. 9, Memorandum from the OIG Acting Counsel to the General Counsel of the Social Security Administration.] The notice referred 1,787 applications, all involving attorney Conn, for which it had reason to believe fraud was involved. [*Id.*] For reasons not stated in the record, this initial referral was with the understanding that no adverse action would be taken against any of the individuals on the list, until further notice. [*Id.*]

---

2015. [*Id.*] Griffith's hearing was held on February 1, 2016. [Pikeville Civil Action No. 7: 16-101; Record No. 11-1, p. 3] The ALJ's decision was issued on February 22, 2016. [*Id.*] Review by the Appeal Council of this decision was denied on March 21, 2016 (after the new rulings took effect). [*Id.*]

On May 12, 2015, the OIG notified the Commissioner that there were no objections "to [the Agency] moving forward with its administrative processing of the redeterminations of the 1,787 individuals whose names were previously provided by OIG to [the Agency] on July 2, 2014." [*Id.*]  Six days later, the plaintiffs were notified by the Agency that there was reason to believe fraud or similar fault was involved in their applications for benefits. [*See, e.g.,* Ashland Civil Action No. 0: 16-017; Record No. 7-1, p. 10.]

Via letters captioned "Notice of Appeals Council Action," the Agency informed the plaintiffs that, pursuant to this notification, it was required to redetermine their benefits under sections 205(u) and 1631(e)(7) of the Act, 42 U.S.C. §§ 405(u), 1383(e)(7). [*Id.*]  The notice explained that, as part of the redetermination, the Agency was not permitted to consider evidence submitted by any of the four physicians believed to have been involved in the alleged fraud. [*Id.* at p. 11]   The letters also informed the plaintiffs that, having undertaken the redetermination, a preponderance of the non-disregarded evidence did not support their previous disability finding. [*Id.*]  Because of this conclusion by the Appeals Council, the Agency planned to set aside their favorable decisions and send their cases back to a new ALJ for further consideration and issuance of a new decision. [*Id.*]  The plaintiffs were given 10 days to submit additional evidence to the Appeals Council before their cases would be sent to a new ALJ. [*Id.* at p. 12]   Extensions were made available when requested, and the record reflects that Plaintiff Griffith was granted a 30-day extension. [Pikeville Civil Action No. 7: 16-101; Record No. 33, p. 14]

The plaintiffs' cases were then remanded to new ALJs for new hearings, and the plaintiffs were permitted to submit further evidence to the ALJ prior to the new hearings. [*See, e.g.,* Ashland Civil Action No. 0: 16-017; Record No. 7-1, p. 10.]  Some plaintiffs, such as

-12-

Griffith, obtained counsel to assist them at their hearings [Pikeville Civil Action No. 7: 16-101; Record No. 11-1, p. 3], while others, such as Carter, did not have counsel [Ashland Civil Action No. 0: 16-017; Record No. 13, p.3].  In each case, the ALJs found insufficient evidence to support the initial disability determinations.  The plaintiffs then submitted their cases to the Appeals Council, which declined to reconsider each of the ALJs' decisions.  These denials constituted final agency action.  Plaintiffs filed the present actions as provided by §405(g).[6]

## II.  THE APPLICABLE STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In deciding whether to grant a motion for summary judgment, the Court must view all the facts and draw all inferences from the evidence in a light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  LEGAL ANALYSIS

Plaintiffs raise two primary claims.  The first, which is the subject of this opinion, is that they were entitled to challenge the Social Security Administration's reason-to-believe that fraud was involved in their award of benefits.  As a legal basis for this claim, plaintiffs cite the Due Process Clause of the Fifth Amendment, the reopening procedures of the Social Security

---

[6]      The right of appeal in Title XVI cases is provided by §1383(c)(3).  This statutory section expressly adopts the §405(g) standards.

Act, and the formal adjudication requirements of the Administrative Procedures Act.  One plaintiff also alleges a violation of the Equal Protection Clause. The second claim, which was not subject of the motions for summary judgment, is that the redeterminations of plaintiffs' claims were not supported by substantial evidence.

### a.   The Due Process Claims

The plaintiffs argue that their due process rights were violated because they were not given adequate notice of the fraud allegation specific to their applications and were not provided the opportunity to challenge that allegation.  It is true that, apart from the general allegations against Conn, Daugherty, Adkins and Huffnagle, the plaintiffs have not been presented with evidence of fraud specific to their applications.  It is also correct that the plaintiffs were not given an opportunity to rebut the assertion there is reason to believe fraud was involved in their prior award of benefits.  However, the plaintiffs' revocation of benefits did not turn on the fraud allegation.  Rather, the revocation turned on the lack of sufficient evidence to support the initial benefits award.  Further, because plaintiffs were given a full opportunity to supplement and/or develop new evidence to substitute for the excluded evidence, they were not denied due process.

### i.   The Plaintiffs' Arguments

Plaintiffs present nearly identical arguments contending that the redetermination process violates due process.[7]  They argue that, because the Agency has not disclosed evidence

---

[7]     Plaintiff Griffith further argues that, as a Title XVI recipient, she is entitled to heightened protection.  [Pikeville Civil Action No. 7: 16-101; Record No. 15-1, p. 8]  Under *Tatum v. Mathews*, 541 F.2d 161 (6th Cir. 1976), Title XVI recipients are generally entitled to pre-termination evidentiary hearing even where Title II recipients are not.  But *Tatum* does not have a direct bearing here because the matter at issue is not whether a pre-termination hearing must take place (it did for both plaintiffs) but what evidence can be submitted and what

proving fraud or similar fault was involved in either of their specific awards of benefits, they have been deprived of benefits "based on a secret document containing allegations of fraud." [*See, e.g.,* Ashland Civil Action No. 0: 16-017, Record No. 13, p. 5; Pikeville Civil Action No. 7: 16-101, Record No. 15-1, pp. 6-7.]  Along with this alleged withholding of evidence, the plaintiffs state that they have not been given the opportunity to challenge the allegation of fraud, until the present litigation.  [*Id*.]  The crux of their due process claim is that, because the fraud allegation is the fact upon which the redetermination and termination of benefits was based, the evidence of fraud must be disclosed and they must have the opportunity to challenge that evidence.  In support, they cite the admonition of *Goldberg v. Kelly* that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." 397 U.S. 254, 270 (1970).  Additionally, "due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.*

### ii.    The Due Process Test

Due process is not a fixed concept.  Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  *Mathews v. Eldridge*, 424 U.S. 319, is the seminal case for determining the requirements of due process.  *Eldridge* involved a Title II beneficiary whose benefits were

---

evidence may be rebutted at that hearing.  *Eldridge* remains good law for the basic test of determining the process that is due.  While it may be that SSI recipients are generally entitled to greater protection because their benefits are based on financial need, that fact alone is not sufficient to alter the bottom-line result as it relates to the ability to challenge the fraud allegation.

terminated after a routine reevaluation of his disability.  The plaintiff, George Eldridge, was entitled by Agency policy to a hearing, but the hearing was not provided until after his benefits were terminated.  Eldridge argued that due process required a hearing *prior to* the termination of his disability benefits.  In support, Eldridge cited *Goldberg v. Kelly*, 397 U.S. 254, which held that welfare beneficiaries have a right to an evidentiary hearing prior to termination of those benefits. 424 U.S. at 325.

In evaluating Eldridge's claim, the Court acknowledged that disability benefits constitute a statutorily-created property interest.  424 U.S. at 332.  Therefore, an individual's continued receipt of those benefits is protected by the Fifth Amendment.  *Id*.  The Court explained that such Fifth Amendment protection included "the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction." *Id.* at 333 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring) (internal quotation marks omitted)).  More to the point, the Court acknowledged that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

After outlining the basic due process framework, the *Eldridge* Court discussed the process that is required before any deprivation may occur.  It noted that in only one case (i.e., *Goldberg v. Kelly*) had the Court held that "a hearing closely approximating a judicial trial" was necessary. 424 U.S. at 333.   As one example of a lesser requirement, the Court cited *Bell v. Burson*, 402 U.S. 535 (1971), which concluded that a probable-cause determination was sufficient prior to the suspension of a driver's license.  Illustrated by these examples, the Court reiterated the holdings of *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), and

*Morrissey v. Brewer*, 408 U.S. at 481, that due process is not a technical conception with fixed content, but is flexible and situationally-dependent.  To determine what is required in particular circumstances, the *Eldridge* Court set out the following three factor test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334–35.

Applying this test, the Court found that Eldridge was not entitled to a pre-termination hearing.  Regarding the first factor, it determined that, because the claimant would be awarded full retroactive relief if he ultimately prevailed, his sole interest was in the "uninterrupted receipt of the source of his income pending [a] final administrative decision on his claim."  *Id.* at 340.  The Court noted that, unlike *Goldberg* where welfare benefits were tied to financial need, Eldridge's Title II benefits were not.  *Id.* at 341.  Despite the possibility that the "hardship imposed upon the erroneously terminated disability recipient may be significant," the Court held that this was not enough to warrant a full evidentiary hearing.  *Id.* at 342-43.

Regarding the second factor, the Court looked to what process was currently in place. It noted, that unlike *Goldberg*, where a wide variety of information was relevant to the welfare determination, the disability determination was based on "routine, standard, and unbiased medical reports by physician specialists."  *Id.* at 344 (internal citations omitted).  Next, regarding safeguards in place, the Court identified the policy of allowing the recipient full access to all of the information the state agency relied upon.  *Id.* at 345-46.

-17-

Finally, the Court looked at the public interest, including the administrative burden and costs of providing a pre-termination evidentiary hearing in all cases, as of right. *Id.* at 347. It held that, while the "[f]inancial cost alone is not a controlling weight," these costs would not be insubstantial, and at some point, the cost of more safeguards for those thought undeserving will "come out of the pockets of the deserving." *Id.* at 347-48.

Ultimately, the Court concluded that, more important than the "ad hoc weighing of fiscal and administrative burdens against the interests of a particular category of claimants" was the determination of "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348. Because, in the "wise admonishment of Mr. Justice Frankfurter," the "differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.'" *Id.* (quoting *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 (1940)). In light of these considerations, the administrative procedures in place which did not provide an evidentiary hearing prior to termination fully comported with due process.

The *Eldridge* test has been used broadly over the past decades, and applies here in evaluating whether the redetermination process afforded plaintiffs comports with due process. *See Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 620 (6th Cir. 2010) (applying *Eldridge* to determine whether a social security hearing "passes constitutional muster"). A notable, recent decision applying the *Eldridge* test is *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). *Hamdi* held that a citizen-detainee seeking to challenge his classification as an enemy combatant was entitled, under the Due Process Clause, to notice of the factual basis for his classification and a fair opportunity to rebut that factual assertion before a neutral decisionmaker. *Id.*

Before evaluating whether due process requires a hearing on the fraud allegation, the Court must consider the role of the fraud allegation in the termination of plaintiffs' benefits. Under sections 205(u) and 1631(e)(7) of the Social Security Act, the fraud allegation has two effects. First, it triggers a redetermination of benefits. Second, it establishes a rule that any evidence related to the alleged the fraud is to be disregarded during the redetermination.

### 1. The First *Eldridge* Factor:  Private Interest

Social Security benefits are government entitlements, and it is undisputed that individuals have a constitutionally protected property interest in such entitlements. 424 U.S. at 332. However, the degree of protection depends on the nature of the entitlement and the scope of the deprivation. In *Eldridge*, the plaintiff was being deprived of Title II Social Security benefits, akin to the majority of plaintiffs here. However, in *Eldridge*, the deprivation was temporary, pending further agency action. Here, plaintiffs are faced with final agency action.

*Eldridge* held that the interest will be highest where the interest in question constitute "the very means by which [plaintiffs] live." 424 U.S. at 340. *Eldridge* went on to recognize that, because Title II DIB is an insurance program that does not take into account other assets or income, the interest is not so severe as when welfare benefits are at stake. The majority of plaintiffs here are Title II recipients. It is not well-established in the record what other sources of income they may have.[8] The Court does not turn a blind eye towards the reality of plaintiffs' situations. For many, their Title II benefits amount to the majority, if not the entirety, of their monthly income. Therefore, recognizing that Title II is an insurance rather than a welfare

---

[8]      Four of the nine were granted *pauper* status.

program, but acknowledging that the disability income is likely the entirety of their present monthly income, plaintiffs' interest is substantial.  Further supporting the finding of a substantial interest is the fact that final agency is here involved, and because Title II benefits require qualifying quarters of employment, plaintiffs are uniformly unable to immediately reapply for Title II benefits.

Plaintiff Griffith was a Title XVI recipient solely.  [Pikeville Civil Action No. 7: 16-101; Record No. 11-1, p. 6]  Because Title XVI benefits are based in part on financial need, they are more akin to welfare benefits.  However, the record does establish that Griffith's Title XVI benefits were not her sole source of household income.[9]  Griffith's interest, therefore, is just as substantial as the interests of the other plaintiffs.  Finally, Plaintiff Martin was a Title II and Title XVI recipient.  [Pikeville Civil Action No. 7:  16-111; Record No. 10-2, p. 7] Martin was not granted *pauper* status, based on available assets.  However, the record does not establish whether Martin has another sources of income for subsistence.  Martin's interest, therefore, is equally substantial.

There remain other options available for plaintiffs.  Plaintiffs Griffith and Martin are not barred from reapplying for Title XVI benefits, because Title XVI benefits require no qualifying quarters of employment.  In fact, the record reflects that Griffith has reapplied.  Of course, the Title II recipients may also now apply for Title XVI benefits, granted they fall within the income range.[10]

---

[9]     As stated during the hearing on the plaintiffs' motions for injunctive relief, Griffith resides with her daughter and a disabled sister, both of whom have independent sources of income.  Furthermore, Griffith has begun receiving food stamps.

[10]     The record suggests that Plaintiff Carter now qualifies for Social Security retirement benefits. [Ashland Civil Action No. 0: 16-017, Record No. 1-1, p. 3; statement of Counsel for

Importantly, all plaintiffs may apply for waivers of their overpayment.  If waivers of overpayment are granted (which is likely), and the plaintiffs are awarded Title XVI benefits, the award will go a long way to making them whole.  One of the factors for waiver of overpayment is whether the beneficiary was at fault for the overpayment. See 42 U.S.C. §404(b).  That is, as stated in SSR 16-1p, the Commissioner considers whether the claimant bears individual responsibility for the overpayment, in determining whether to grant a waiver. The Commissioner, therefore, would need specific evidence that a plaintiff was at fault for the overpayment to deny a waiver.  Counsel for the Commissioner represented during a hearing in a related case, Pikeville Civil Action No. 7: 16-035-JMH, that the Agency currently has no such evidence of individual fault for any of the *Conn*-related plaintiffs.

The record does not reflect whether hearings are provided when former beneficiaries apply for waivers.  However, Griffith cites *Califano v. Yamasaki*, 442 U.S. 682, 696–97 (1979), for the proposition that claimants are entitled to an oral hearing on fraud allegations before they may be held at fault for an overpayment.  [Pikeville Civil Action No. 7: 16-101; Record No. 32, p. 11]  While *Califano* is inapposite to whether plaintiffs should receive a hearing on fraud prior to the redetermination (where no fraud is being imputed on them), its holding is applicable as relates to plaintiffs' applications for waivers.  Unlike the circumstance presented here, where the redetermination process requires no specific finding of fraud or

---

Commissioner at August 29, 2016 hearing]  As represented by counsel for the Agency, if Carter applies for a waiver of overpayment, his retirement benefits will resume during the pendency of the waiver determination.  And if the overpayment waiver is ultimately approved, Carter will suffer no ongoing harm.  His interest at stake will then be any lost benefits between the termination of his benefits and his return to pay status.

similar fault on the part of the beneficiaries themselves (and is based on other evidence)[11], the waiver provision seems to turn on such evidence.  Such a hearing would substantially narrow (if not moot entirely) the present case as it relates to Carter.  And if Griffith were legitimately eligible for Title XVI benefits in 2008 due to an intellectual disability, she likely remains eligible on reapplication.  If she is awarded benefits on a new application, she will be in the same position as Carter, meaning a hearing on her entitlement to a waiver would substantially provide the relief she seeks.  Regardless of whether the above possibilities come to pass, there exists a present gap in coverage for both plaintiffs during which no retroactive payment will be made.

### 2.  The Second *Eldridge* Factor:  The Risk of Erroneous Deprivation

Accepting that the loss of these benefits will constitute a considerable hardship for plaintiffs, the focus turns to the risk of *erroneous* deprivation of these benefits.   Despite the hardship, plaintiffs remain entitled to the benefits only if they meet the statutory parameters for disabled status.  The risk of erroneous deprivation is evaluated in light of the procedural protections in place.

During the redetermination process, the Agency examines all of the evidence considered at the time of the original award, with the exception of evidence related to the alleged fraud.  Individuals subject to the redeterminations are entitled to submit new evidence, as long as the evidence relates to the time period of the original award.  Individuals have two

---

[11]     While the finding of fraud is a predicate fact without which their termination of benefits would not have occurred as it did, a "but for" cause to use the language of tort law, it is not the proximate cause of the termination.  The proximate cause of the termination was the lack of sufficient evidence, outside the evidence deemed tainted, to support the finding of disability.

separate opportunities to submit new evidence.  First, new evidence may be submitted after the initial notification, before the Appeals Council remands the case to an ALJ.  If this evidence is not sufficient to change the determination of the Appeals Council, the case will be remanded for a new ALJ hearing.  Individuals are then entitled to submit further evidence prior to their hearing before the new ALJ.  Importantly, when requested, the Agency will assist beneficiaries in obtaining and developing new evidence.  This newly-developed evidence may serve as a substitute for any excluded evidence.

The redetermination process imposes a possible difficulty of acquiring new medical evidence to show signs of a sometimes decades-old disability.  Such a task is burdensome, considering that medical record retention practices often result in records being destroyed within that time frame.  However, the Agency will consider newer records that provide backward-looking evidence of disability.  Further, the Agency will assistance beneficiaries in obtaining new evidence of a pre-existing disability, which is possible because an individual's present physical state is likely to show signs of historical conditions.

The greatest risk of erroneous deprivation come from the exclusion of certain evidence.  Of course, this risk depends entirely upon the probative value of the excluded evidence.  In the cases of plaintiffs Carter and Griffith, for example, neither Drs. Huffnagle nor Adkins were the plaintiffs' treating physicians.  The testimony of non-treating physicians is, by rule, not given heavy weight in applications for benefits.[12]  If ALJ Daugherty violated internal policy[13] by giving this evidence more weight than it deserved, then redetermination is likely to produce

---

[12]    *See* Hearing Transcript, Pikeville Civil Action No. 7: 16-035-JMH; Record No. 54, p. 21.

[13]    *Id.* at p. 20.

a different result regardless of whether that evidence is ignored. Not only is it alleged that ALJ Daugherty was giving the evidence from these non-treating physicians improper weight, but that he was not weighing the evidence at all. Simply put, he accepted these physicians' opinions at face value. The duty of an ALJ is to weigh the evidence, not accept it at face value.

Because the evidence being ignored is most likely entitled to little (rather than controlling) weight, and because plaintiffs may, with the assistance of the SSA, effectively substitute for the forgone evidence, the risk of "erroneous deprivation" is low. The plaintiffs in these cases have one thing in common: the record before the ALJ on redetermination is voluminous, and contains hundreds of pages of evidence that was available at the initial denials.

The plaintiffs propose as a substitute safeguard allowing a hearing on whether the evidence should be excluded. Because the statute requires the Agency to disregard any evidence that is believed to be fraudulent, such a hearing would include a determination of whether there is reason to believe fraud existed. Evaluating the probative value of such a procedure means considering who might be subpoenaed to testify, and who would bear the burden of proof. It seems the government would have to show by a preponderance of evidence that fraud existed, and the plaintiffs would have to rebut that showing. Because there is evidence sufficient for a criminal indictment, the government would likely have little trouble meeting its burden.

In truth, there need be no specific showing that fraud existed in a particular plaintiff's case if there is sufficient evidence demonstrating a conspiracy among the key actors in their disability determination. However, it is quite unlikely that the plaintiffs could succeed in rebutting such a showing where their potential witnesses are under criminal indictment.

Additionally, any evidence plaintiffs may present to show they were properly eligible for disability benefits would not be relevant to whether fraud was involved.

In theory, the substitute safeguard proposed by the plaintiffs would have substantial probative value because, if a plaintiff is able to refute the reason to believe fraud or similar fault was involved, then the redetermination process would be unnecessary. And without reason to believe there was fraud, the plaintiffs would not only be entitled to use the excluded evidence, they could avoid the redetermination altogether. In reality, however, the probative value of a hearing on the fraud will be of negligible value. The plaintiffs' core interest is in the retention of their disability benefits, not in avoiding the redetermination. While a successful rebuttal of the fraud allegation would seem to ensure continued receipt of benefits (notwithstanding other avenues the Agency has available for reopening or redetermination), the inability to rebut the allegation does not compromise the plaintiffs' right to prove they were legitimately eligible for benefits. In short, while proper entitlement to benefits is irrelevant to the fraud allegation, it is wholly relevant during the redetermination proceeding. When it comes to the actual probative value of a fraud hearing on the plaintiffs' ability to retain their benefits, the reality is that it will be relatively meaningless at this stage.

### 3. The Third *Eldridge* Factor: The Government's Interest

The third factor for consideration is the government's interest, including the function involved and the financial and administrative burdens that the additional or substitute procedural safeguards would entail. As an initial matter, such additional procedures would seem to undermine the swift termination of benefits that was the purpose of the redetermination process. However, such a burden matters little if it is necessary for due process by eliminating the risk of erroneous deprivation of benefits (erroneous deprivation was, of course, not the

intent of the statute).  Again, in reality, and as mentioned above, such hearings would likely be of minimal value to a plaintiff's ultimate ability to retain benefits.  However, this procedure could require substantial time and interfere with ongoing criminal prosecutions.

The Agency does not allege, at this stage, that the plaintiffs had knowledge of or were involved in the alleged fraud.  Criminal prosecutions are ongoing for those allegedly responsible for the claimed fraud.  Part of the fraud allegation is that the physicians were signing pre-completed residual functional capacity forms.  The Agency may not have proof of fraud in each particular circumstance, but neither does it wish to deprive deserving individuals of benefits to which they are rightfully entitled.  Congress decided to strike the balance by requiring a redetermination that disregards fraudulent evidence, and the Agency developed processes through which beneficiaries may submit new evidence to supplement their dated application, and may receive assistance in doing so.  The United States has undertaken criminal proceedings where warranted.  To require a full-fledged judicial-type hearing on the fraud in this this administrative context would frustrate the ability of the redetermination process to operate.  Requiring the Commissioner to obtain the relevant evidence from the OIG, and present it to each individual defendant could also risk compromising the criminal prosecutions.

Additionally, as mentioned above, the validity of any single piece of evidence is no defense to whether it was created as part of the fraud conspiracy.  Given the number of beneficiaries that have been successful through the redeterminations,[14] alleged fraud does not mean otherwise ineligible for benefits.  However, it is difficult to determine what rebuttal evidence a claimant could present to refute the fraud allegation.  The important question is

---

[14]     Roughly 46% according to Counsel for the Acting Commissioner. *See* Hearing Transcript, Pikeville Civil Action No. 7: 16-035-JMH; Record No. 54, p. 5.

whether the claimants will have the ability to refute the allegation that they themselves were involved in the fraud, or had similar fault.  As mentioned above, such determinations will take place at the waiver application stage.  Because there is a strong public interest in maintaining the integrity of the criminal prosecution, and not needlessly tying-up the process of redetermining benefits, the final interest weighs in favor of the government.

Despite the substantial interest of plaintiffs in their Social Security benefits, the risk of erroneous deprivation is not enough to warrant the substitute safeguard they seek.  Further, the additional process they seek could substantially interfere with other important interest.  In the end, because the fraud allegation is not the proximate cause of their benefits being removed, unlike the enemy-combatant determination in *Hamdi* (which was the direct cause of *Hamdi's* confinement) and because plaintiffs are given a meaningful opportunity to substitute for the excluded evidence, they have not been deprived due process.

In addition, being subject to a redetermination without a threshold adjudication does not violate due process.  As was the case in *Eldridge*, beneficiaries are subject to routine reevaluations.  The regulations at 20 C.F.R. § 404.988 provide limitations regarding when the Commissioner may reopen benefits determinations, with a general limit of four years absent any of the stated conditions.  Congress is free to mandate more frequent reviews of Title II or Title XVI benefits without violating the due process rights of beneficiaries.  While beneficiaries have a property interest in their previously-awarded benefits, they do not have a constitutional interest in not being subjected to a continuing assessments of eligibility.

### iii.  Lack of a Complete Record

Griffith raises an additional due process challenge, claiming that there is no exhibit list from the initial determination attached to the redetermination.  [Pikeville Civil Action No. 7:

16-101; Record No. 15-1, p. 7]  She contends that, without the list, it would be impossible to properly evaluate on redetermination whether the initial award was supported by the record that existed at the time.  As an initial matter, this claim was not raised in her Complaint, but rather in her response to the motion to dismiss.  Leave to amend, as required by Fed. R. Civ. P. 15(a), is to be "freely given when justice so requires."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, because Griffith gave no indication that she intended her response to be construed as an amended complaint, doing so would be improper.  *See Dearing v. Mahalma*, No. 1:11-CV-204, 2011 WL 3739029, at *6 (S.D. Ohio Aug. 24, 2011) (improper to construe pleading as amended complaint absent indication of *pro se* plaintiff's intention to do so).

Even if this claim has not been waived, it fails on the merits.  Griffith failed to indicate, even generally, what evidence was absent during the redetermination.  In her reply to the motion for a preliminary injunction, Griffith alleges that "there are errors or omissions present in the 2015 exhibit list which hint at the incomplete nature of the Commissioner's reconstruction of Plaintiff's file."  [Pikeville Civil Action No. 7: 16-101; Record No. 32, p. 2] While a failure to provide a complete and accurate record is problematic, Griffith has provided only a suggestion of an incomplete record, noting unspecified "errors or omissions" which "hint" at an incomplete record.  Unspecified "hints" are not enough to demonstrate a likely success on the merits.

Griffith cites *Island Creek Coal Co. v. Holdman,* 202 F.3d 873 (6th Cir. 2000), for the proposition that an agency's failure to preserve records will violate due process.  However, as later decisions have made clear, a plaintiff must show that the lost records were vital to their claims, not just that the evidence lost *hypothetically* could be helpful.  *Wells v. Astrue*, No. CIV. A. 09-32-GWU, 2009 WL 5214488, at *1 (E.D. Ky. Dec. 23, 2009) (citing *Energy West*

-28-

*Mining Company v. Oliver,* 555 F.3d 1211, 1270 (10th Cir. 2009)).  And here, the Griffith's claims are hypothetical.  Apart from asserting the absence of an exhibits list, and alleging misidentified exhibits in the new list, Griffith fails to allege that there was any substantive evidence from her 2008 application that was not considered during the redetermination.  She makes a hypothetical claim, with the rhetorical question of "what else might be missing?"

While waived as a claim under due process, Griffith may develop this argument under her claim that the redetermination was not supported by substantial evidence.  The substantial evidence claim was not raised at the preliminary injunction stage, and was not challenged in the Commissioner's partial motion to dismiss.  At the preliminary injunction stage, however, these hypothetical allegations do not tend to show a likely success on the merits.  Agency counsel suggested at the related *Perkins* hearing that the ALJ responsible for the initial determinations in these cases failed to follow agency procedure[15], which makes it equally likely that the missing exhibit list is the result of one never having existed in the first place.

### b.  The Equal Protection Claim

Plaintiff Carter also raises an Equal Protection Clause challenge.  Carter's Amended Complaint states, "[t]he plaintiff seeks a declaratory judgment from the Court that the Defendant's actions described herein violated the Equal Protection Clause of the United States Constitution."  He goes on to assert that "[t]he Plaintiff is a persons [sic] receiving Social Security Disability benefits" and "[t]he Defendant has not alleged any wrongdoing by Plaintiff."  [Ashland Civil Action No. 0: 16-017; Record No. 4, p. 9]  Piecing the allegations

---

[15]     *See* Hearing Transcript, Pikeville Civil Action No. 7: 16-035-JMH; Record No. 54, p. 20.

together, Carter claims that having his benefits terminated in the absence of an allegation of wrongdoing violates equal protection.

The Equal Protection Clause bars "distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Mere unfair treatment does not amount to a violation of equal protection. *See Bass v. Robinson*, 167 F.3d 1041, 1050 (6ᵗʰ Cir. 1999). The redetermination statute is generally applicable and does not single out any individual or class of individuals for disparate treatment. Neither do the Agency's rules and procedures make distinctions which burden a fundamental right or intentionally treat some individuals differently without a rational basis for the difference.

To be sure, the Agency does make a distinction regarding who may challenge fraud allegations. Where fraud allegations are discovered by or referred to the Commissioner directly, and a redetermination is undertaken because of such allegations, the beneficiary is given the opportunity to challenge the fraud allegation in their hearing before an ALJ. However, when referrals are made through OIG, the Commissioner does not permit a challenge to the fraud allegation. Assuming that disability benefits or the right to challenge the evidence presented against a claimant is a fundamental right, the distinction drawn by the Agency has a rational basis. The OIG is a quasi-independent office within the Agency, and its sources of information may differ from those of the Commissioner. Therefore, it is reasonable that the Commissioner would permit a hearing to challenge fraud allegations that arise through her office, but not those that arise through the OIG.

-30-

### c.  The Social Security Act

Apart from their due process challenges, the plaintiffs allege that a hearing on the alleged fraud should be required as a matter of statutory interpretation.  The crux of the parties' disagreement is whether the language of the Act leaves room for the Agency to provide hearings, as part of the redetermination process, on OIG's finding that there is reason to believe fraud was involved in an application for benefits.  The Agency is entitled to deference in interpreting its own statutes, and the plaintiffs' argument is unavailing.  Plaintiffs also argue that the Agency violated the Act by failing to take action "immediately" in making the redetermination.  Because the plaintiffs cannot demonstrate either a statutory violation or the right to a remedy for such a violation, this argument also fails.

### i.  A Reopening versus a Redetermination

The parties do not address in detail the distinction between the reopening and the redetermination procedures.  However, the Agency contends that, under the reopening procedure, it makes a finding regarding whether a beneficiary is *currently* entitled to benefits, as opposed to only considering whether he or she was entitled at the date of his or her original grant.  As argued by the Agency here, Congress was well-aware of the procedures for reopenings at the time it passed the legislation mandating the redetermination process.  Given that the purpose of the new legislation was to create a streamlined process to cut-off fraudulently obtained benefits, and because Congress knew the reopening process was "cumbersome and unworkable," it stands to reason that it did not intend for the same process to be utilized.[16]  Citing the same source, the plaintiffs argue that the legislative history

---

[16]     STAFF OF SUBCOMM. ON OVERSIGHT OF THE H. COMM. ON WAYS & MEANS, 103RD CONG., REP. ON REFORMS TO ADDRESS SUPPLEMENTAL SECURITY INCOME FRAUD AND ABUSE

demonstrates that Congress *did* intend a reopening to take place where there is evidence of fraud.[17]   However, the plaintiffs' contention is merely a play on words.   While the Congressional report uses the word "reopen" when it discusses the new procedures, it is clear that Congress expected a much different process than the one already in place.   The ensuing legislation, therefore, termed the new process a "redetermination."

Further, while there is little ambiguity on this point, the Commissioner's interpretation is entitled to deference.   The interpretation is expressed in Social Security Ruling 16-1p, which makes clear that "[f]raud and similar fault redeterminations under sections 205(u) and 1631(e)(7) of the Act are distinct from reopenings as described in 20 CFR 404.987 – 404.996 and 20 CFR 416.1487 – 416.1494." SSR 16-1p n.1.   Section (D)(3) of the same ruling states that "[a]n individual may appeal our finding of fraud or similar fault.   However, we will not administratively review information provided by SSA's Office of the Inspector General under section 1129(l) of the Act regarding its reason to believe that fraud was involved in the individual's application for benefits."   As the Sixth Circuit stated in *Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 557 (6th Cir. 1995), "[a]lthough social security rulings do not have the force or effect of law, we are persuaded that *Chevron* [deference] applies to social security rulings insofar as the rulings directly involve construction of the statute." *See also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (an agency's rulings, interpretations and opinions under its statute are entitled to deference).

---

INVOLVING   MIDDLEMEN   7-8   (Comm.   Print   1994)   *available   at* http://congressional.proquest.com/legisinsight?id=CMP-1994-WAM-0010&type=PRINT

[17]        *Id.*

The conclusion that redeterminations under sections 205(u) and 1631(e)(7) are distinct from reopenings is not expressed only in a footnote, but it is apparent also from the Social Security Administration's promulgation of distinct guidelines for the process, most notably HALLEX I-1-3-25.   Additionally, the distinction between permitting hearings on fraud allegations that arise from the Commissioner, but not from the OIG, is articulated in the same section of HALLEX.   Counsel for the Commissioner seemed to allege at the hearing held in Plaintiff Perkins' case that the statute *does not permit* hearings on the fraud allegations.   [*See* Hearing Transcript, Pikeville Civil Action No. 7: 16-035-JMH; Record No. 54, p. 26.]   Given that the statute does not make an express distinction between fraud allegations referred through the OIG and those arising through other means, this argument is unconvincing.   Nonetheless, because the statute is silent on hearings, and, as addressed below, it stands to reason that Congress did not envision hearings on the threshold question of fraud, this interpretation is reasonable and entitled to deference.

### ii.   The Effect of Delaying the Redetermination Process

The plaintiffs also claim that the OIG and the Commissioner violated the Act by failing to undertake the redeterminations "immediately."   Title 42 of the United States Code, section 405(u), provides that the Commissioner is to act immediately to redetermine benefits where there is reason to believe that fraud was involved in a beneficiary's application.   While the Commissioner may have had reason to believe fraud was taking place in 2006, the statutory mandate for fraud investigations is vested in the OIG.   [Ashland Civil Action No. 0: 16-017; Record No. 17, p. 10]   The language of 42 U.S.C. §1320a-8(l) provides that the OIG is to make information available to the Commissioner immediately when there is reason to believe fraud has taken place, but it provides that the OIG may delay if such a referral would interfere with

-33-

a pending criminal investigation.  Because triggering redetermination proceedings for some 1,800 individuals would have interfered with criminal proceedings, and because §405(u) requires that the redetermination proceedings begin immediately upon notice of possible fraud, any delay in the referral period was justified here.

Many years passed between the initial accusations of wrongdoing (2007) and the initial (purported) reports to the OIG (2009), and action being taken on the redeterminations (2015). This lapse is at least partially understandable, given the process of investigating and substantiating these claims takes time, especially where internal misconduct and alleged cover-ups were involved.  The statute contemplates delay so as to not interfere with criminal or civil proceedings.  The plaintiffs apparently believe that, if individuals employed by the Social Security Administration were responsible for the delay by their unlawful actions, the Agency must pay the price and not be permitted to proceed.  This argument fails because "the doctrine of unclean hands . . . may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest." *S.E.C. v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980).

The plaintiffs allege that there was inexcusable delay in redetermining their benefits, which prejudiced them because the lapse of time made it more difficult to present additional evidence to bolster their claims of disability.  Admittedly, a more expeditious process would have benefitted all parties involved, including the public fisc.  In fact, this is the very reason for the statutory command that such redeterminations be undertaken immediately. Unfortunately, the delay that the plaintiffs reference, including alleged adverse action against whistleblowers, was part-and-parcel to the fraud on which the redeterminations are based.  As held by other courts, the doctrine of unclean hands is only available against the government

-34-

"where the alleged misconduct occurred during the investigation leading to the suit and the misconduct prejudiced the defendant in his defense of the action." *S.E.C. v. Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd sub nom. S.E.C. v. Calvo*, 891 F.2d 457 (2d Cir. 1989) (internal citations omitted).[18]

It may be that, for some plaintiffs, a more prompt redetermination would have made it easier to find substitute medical evidence. But if the time lapse makes it difficult or unlikely that anyone can prevail through the redetermination process, the proper remedy is through the due process clause. The statutory immediacy prescription is not a statute of limitations, but a directive tied to the purpose of the statute (i.e., the prompt termination of fraudulently obtained benefits). More expeditious redeterminations would have benefitted all parties and the public, but the plaintiffs have failed to show that the time lapse actually amounts to a violation of the statute, or that a remedy exists for such a bare statutory violation. *See Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 23–24 (1979) (to determine whether a private remedy exists in a statute "the central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action").

The plaintiffs further argue that, to excuse the delay, a written certification from the United States Attorney is required. In the present case, the Agency has not provided a written certification that proceeding with the redeterminations would hamper the ongoing criminal investigation. Regardless of whether a certification exists, it is not clear that plaintiffs would have a claim because there is no evidence in the statutory language to suggest that those who

---

[18]     "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." 689 F. Supp. at 73.

received benefits through a fraudulent scheme (whether witting or unwitting participants) are the class of individual meant to be protected by the immediacy requirement.  Instead, the statutory history suggests that the immediacy requirement was intended to protect the public fisc.

### iii.  Other Considerations

Despite the Court's finding that Congress intended the redetermination process to be distinct from reopenings, or that the Agency's determination is entitled to deference, plaintiffs allege a hearing on the fraud allegation is required nonetheless.  Counsel for a plaintiff in a related proceeding stated that, because Congress intends its statutes to be interpreted in a Constitutional way, it follows that a hearing on the fraud allegation must be part of the redetermination process.  [*See* Hearing Transcript, Pikeville Civil Action No. 7: 16-035-JMH; Record No. 54, p. 43.]  However, because the plaintiffs have not made the requisite showing that the absence of a hearing is constitutionally problematic, this argument is without merit.

If, as shown, Congress intended to streamline the process for terminating benefits, it is not clear that they envisioned hearings on the fraud allegations.  Because the fraud allegation is the trigger for the redetermination, if beneficiaries are able to challenge the fraud allegation, it must be before the redetermination process goes forward.  This is contrary to another option where beneficiaries would still be subject to a redetermination, but would be able to use otherwise excludable evidence.  Therefore, the remedy to which the plaintiffs are entitled if they prevail is not a new redetermination with full evidence but, instead, is a hearing on the fraud.  If plaintiffs were to prevail at such a hearing, their benefits would have to be reinstated.

Again, without reason to believe there is fraud, there is no statutory basis for the redetermination process.  It would be a very cumbersome process if Congress had drafted

section 205(u) of the Act to read "where there is reason to believe fraud existed, the Commissioner shall provide the beneficiary the opportunity to rebut the fraud allegation, and if unable to rebut the fraud allegation, the Commissioner will proceed to determining benefits while disregarding all evidence that there is reason to believe is fraudulent."   This is not the framework Congress put into place.

### d.  The Administrative Procedures Act

The plaintiffs further allege that the Commissioner violated the Administrative Procedures Act.  Plaintiffs argue that the redetermination procedures should have been subject to notice and comment rulemaking, and that the redetermination hearings should have been conducted as formal "on the record" adjudications.  This argument also lacks merit.

Notice and comment rulemaking is required for new rules that bind, not for interpretative rules, or for rules of an agency's organization, procedures, and practice. 5 U.S.C. § 553(b)(3)(A).   Therefore, the redetermination procedures are not subject to notice and comment rulemaking.  The second APA contention regards formal adjudication.  The APA establishes procedures for adjudications required by statute to be "on the record after opportunity for an agency hearing." 5 U.S.C. §554.  The statute governing redeterminations, 42 U.S.C. §405(u)(1)(A), has no such requirement.  Therefore, the suggestion that "on the record" adjudication is required fails.

Finally, the plaintiffs allege that the OIG's involvement in the redetermination process is a violation of 5 U.S.C. §554(d)'s prohibition on third party involvement in adjudications.  This prohibition, as part of the rules for on-the-record adjudication, does not apply to the redeterminations.  Even if redeterminations were subject to on-the-record adjudication, the OIG did not direct the outcome or otherwise involve itself in the redetermination process.  And

because a separate statute mandates the referral process, this provision of §554(d) would be without effect.

### i.      On-the-Record Adjudication

Much of what the plaintiffs seek under the Due Process Clause and the Social Security Act they also seek under the APA; that is, the opportunity to present their case against the fraud allegation and to present rebuttal witnesses.  Because there was no formal finding of fraud, there is no argument to rebut.  The requirement for formal, on the record adjudication is found at 5 U.S.C. §554.  The statute prescribes specific procedures where a statute requires adjudication "on the record after opportunity for an agency hearing."  The statutes governing redeterminations (i.e., 42 U.S.C. §§405(u)(1)(A) and 1383(e)(7))  do not require a hearing. Therefore, the suggestion that "on the record" adjudication is required is equally misplaced.

### ii.      Notice and Comment Rulemaking

Notice and comment rulemaking is required for new rules that bind, not for interpretative rules, or rules of an agency's organization, procedures, and practice.  5 U.S.C. § 553(b)(3)(A).  Plaintiffs allege that "if, or the extent to which they do, follow HALLEX as law, it violates and does not comport with notice and comment rulemaking."  [*See, e.g.,* Pikeville Civil Action No. 7: 16-101, Record No. 14, p. 10.]

As the Sixth Circuit has held, "[f]or purposes of the APA, substantive rules are rules that create law.  These rules usually implement existing law, imposing general, extra-statutory obligations pursuant to authority properly delegated by Congress.  Interpretative rules merely clarify or explain existing law or regulations and go to what the administrative officer thinks the statute or regulation means."  *First Nat. Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1188–89 (6th Cir. 1991) (internal citations omitted).  *See also Moore v. Apfel*, 216 F.3d

864, 868 (9th Cir. 2000) (Describing HALLEX as "strictly an internal guidance tool . . . that does not carry the force and effect of law.").  Because HALLEX and the Social Security Rulings do not create law, they are not subject to formal hearing requirements.

### iii.    Decisions Directed by a Third Party

In pertinent part, 5 U.S.C. §554(d) states that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings."  As discussed above, the formal adjudication requirements of 5 U.S.C. §554 are not applicable to the redetermination process and, therefore, neither is subsection 554(d).  However, even if §554(d) were applicable, it is not clear the redetermination process would violate it, because the third party involvement is directly authorized and required by the Act.

While the OIG is not wholly independent from the Commissioner, it has no role in the decisions merits decision of whether to continue or rescind benefits.  Its only role is to make the probable cause determination regarding fraud, which, as discussed above, is determinative as to only some evidence (evidence which may be substituted for).  The Agency's final decision is not being directed by the OIG.  Rather, it is made by an ALJ who is not subject to the supervision or the direction of the OIG.

## IV.   CONCLUSION

Plaintiffs' contentions under the Equal Protection Clause, Social Security Act, and Administrative Procedures Act are easily resolved in favor of the Agency.  Because the procedural protections afforded by the Agency satisfy any concern about the exclusion of suspect evidence, plaintiffs' due process arguments are also unconvincing.  While there is little

doubt that plaintiffs have been put in an unfortunate position as a result of the circumstances giving rise to this litigation, the fact remains that plaintiffs were given a meaningful opportunity to reprove eligibility.  The purpose of the redetermination procedures, in line with the mission of the Agency, is to determine whether beneficiaries are properly entitled to benefits.  Because the procedure comports with due process, the legal issues in these actions favor the agency.  And because there exist no material discrepancies that would be appropriate for resolution by a trier of fact, the Acting Commissioner's motions will be granted. Accordingly, it is hereby

**ORDERED** that Defendant Carolyn Colvin, Acting Commissioner of Social Security's motions for summary judgment in part [Ashland Civil Action No. 0: 16-017; Record No. 7] [Ashland Civil Action No. 0: 16-061; Record No. 6] [Pikeville Civil Action No. 7: 16-051; Record No. 12]  [Pikeville Civil Action No. 7: 16-059; Record No. 13] [Pikeville Civil Action No. 7: 16-068; Record No. 16]  [Pikeville Civil Action No. 7: 16-075; Record No. 5] [Pikeville Civil Action No. 7: 16-101; Record No. 11] [Pikeville Civil Action No. 7: 16-111; Record No. 10]  [Pikeville Civil Action No. 7: 16-153; Record No. 9] are **GRANTED**.

This 15th day of November, 2016.



Signed By:

_**Danny C. Reeves**_  DCR

**United States District Judge**

-40-